1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   JANELLE JONES, et al.,                    No.  2:12-cv-2181 TLN CKD

12            Plaintiffs,

13        v.                                    **ORDER**

14   MATTHEW CATE[1], et al.,

15            Defendants.

16

17

18            Defendants Ed Simmerson, John McClellan, Mike McDonald, and Matthew Cate

19   (hereinafter collectively referred to as "Defendants") seek judgment on the pleadings on the

     following grounds: (1) decedent's[2] alleged speech activities were not protected by the First

20   Amendment; (2) Plaintiffs have failed to establish that Defendants McDonald or Cate participated

21   in conduct that violated decedent's First Amendment rights; (3) all Defendants are entitled to

22   qualified immunity; and (4) neither Cate nor McDonald can be liable on Plaintiffs' state law

23   claims because decedent's suicide was an independent intervening cause of his death.  (*See* Defs.'

24   Mot. J. Pleadings, ECF No. 47.)  Plaintiffs oppose Defendants' motion.  (*See* Pl.'s Opp., ECF No.

25

26   _____

     [1]        Defendant Matthew Cate, the former Secretary of the California Department of Corrections and
27   Rehabilitation (CDCR) is identified as Matthew Cates in the First Amended Complaint (FAC), ECF No. 25, and
     Defendants' Answer, ECF No. 27.  Henceforth Defendant Cate shall be identified in this action as Matthew Cate.
     [2]        Plaintiffs Janelle Jones and T.J. (hereinafter collectively referred to as "Plaintiffs") are the wife and son of
28   the decedent Scott Jones.

                                          1

48.)  Defendants have filed a reply to Plaintiffs' opposition.  (See Defs. Reply, ECF No. 49.)  The

Court has carefully considered the arguments presented by the parties.  For the reasons set forth

below, Defendants' motion (ECF No. 47) is GRANTED IN PART and DENIED IN PART.

## I.    **Factual Background**

Plaintiffs, the widow and son of Scott Jones (Jones), filed their original Complaint

against Defendants on August 21, 2012.  (Compl., ECF No. 1.)  The instant First Amended

Complaint was filed on March 22, 2013.  (*See* First Am. Compl. ("FAC"), ECF No. 25.)  The

FAC contains the following allegations.

Jones and Plaintiff Janelle Jones were married.  On February 15, 2001, they had a

son, Plaintiff T. J. Jones.  In July 2002, Jones was hired by the California Department of

Corrections and Rehabilitation (CDCR) as a correctional officer.  He was assigned to work at

High Desert State Prison in Susanville, California (hereinafter "High Desert").  Jones performed

his job well and had "outstanding performance evaluations and complimentary peer reviews."

(ECF No. 25 ¶ 20.)  One of the job duties of a CDCR corrections officer, as set forth in CDCR

policies and procedures, "was to disclose information regarding the wrongful and unlawful

conduct of correctional peace officers."  (ECF No. 25 ¶ 21.)

In 2006, Jones was assigned to work in the Z-unit at High Desert.  The Z-Unit "is a

stand-alone administrative segregation unit housing the most dangerous inmates."  (ECF No. 25 ¶

22.)  On or about August 13, 2006, Jones "suffered a right knee injury while horsing around on

duty in the Z-unit."  (ECF No. 25 ¶ 23.)  He reported the injury to his supervisor, Defendant

Simmerson, stating that he had injured himself while engaged in horseplay with another

correctional officer who had just been promoted.  Defendant Simmerson ordered Jones to report

the injury as an on-the-job worker's compensation injury.  Jones told Defendant Simmerson that

he didn't want to falsify a worker's compensation claim and that the incident had not happened

the way Defendant Simmerson wanted it reported, but Defendant Simmerson ordered him to

submit the report as an on-the-job worker's compensation claim.  Because Jones did not want to

be insubordinate and because he felt "tremendous pressure from his superior officer," Jones did

what Defendant Simmerson ordered him to do.  (ECF No. 25 ¶ 23.)  Jones thereafter went on a

1   leave of absence until February 2007, when he was released to work.

2          In March 2007, Jones was pepper-sprayed in the eyes at close range by another

3   correctional officer, Sergeant Derek Fletcher.  The incident was witnessed by a number of other

4   correctional officers. When the witnesses and Jones questioned Fletcher about why he had

5   pepper-sprayed Jones, "Sergeant Fletcher flippantly responded with words to the effect of 'Does

6   that mean that you are going to rat me out now?'"  (ECF No. 25 ¶ 25.)  Jones told his wife he

7   thought the incident was a warning "to *keep quiet* about the August 2006 incident involving his

8   knee injury and Simmerson ordering him to falsify the cause of his injury on the workers

9   compensation forms."  (ECF No. 25 ¶ 25.)

10         In October 2007, Jones "had knee surgery and spent the next four months in post-

11  operative rehabilitation."  (ECF No. 25 ¶ 26.)  Following his return to work in January 2008, he

12  was assigned to Fence Patrol.  (ECF No. 25 ¶ 27.)  He was subjected to "constant" "verbal

13  harassment by other correctional officers."  (ECF No. 25 ¶ 27.)  Jones reported the harassment to

14  his superiors at High Desert but nothing was done about it.  (ECF No. 25 ¶ 27.)  He was also

15  subjected to "two 'random' drug tests," which had never been required before.  (ECF No. 25 ¶

16  28.)

17         Jones was subsequently reassigned to Z-unit, where he worked with three other

18  correctional officers, Anthony Lares (hereinafter "Lares"), Jesse Barron (hereinafter "Barron"),

19  and Anthony Tirado (hereinafter "Tirado").  (ECF No. 25 ¶ 29.)  For the rest of his employment

20  with CDCR, Jones was often partnered with Lares.  (ECF No. 25 ¶ 29.)  Lares "filed several

21  complaints regarding working conditions" at High Desert and Jones "was a witness to many of

22  these complaints."  (ECF No. 25 ¶ 30.)  Lares "also filed numerous complaints of safety

23  violations, to which [Jones] was a corroborating witness."  (ECF No. 25 ¶ 30.)  Management at

24  High Desert "detested correctional officers who filed complaints regarding the working

25  conditions" at High Desert.  (ECF No. 25 ¶ 31.)  While working in the Z-Unit, Jones "witnessed

26  and complained of numerous events and actions to his supervisors, including but not limited to

27  Defendant Simmerson, that [Jones] believed violated federal or state law" and/or rules and

28  regulations.  (ECF No. 25 ¶ 32.)

1
2
3

> In particular, [Jones] witnessed and complained of: (1) strip-searches of inmates in the snow; (2) provocation of fighting among the inmates; (3) failure to permit inmates to shower; (4) failure to exchange inmates' laundry; and (5) failure to prohibit inmates' possession and transmission of contraband.

4   (ECF No. 25 ¶ 32.) All of the reports were "summarily dismissed," and Jones decided it would

5   be futile to report any more misconduct. (ECF No. 25 ¶ 32.)

6          In addition to not responding to his complaints, Jones's supervisors "falsely

7   accused [him] of misconduct." (ECF No. 25 ¶ 33.) Defendant McClellan "constantly" accused

8   Jones, Lares and Barron of tampering with inmates' mail and the three were threatened with

9   discipline and termination. (ECF No. 25 ¶ 33.) The accusations were investigated and found to

10  be "untrue" but Defendant McClellan continued the harassment. (ECF No. 25 ¶ 33.) Defendant

11  Simmerson called Jones and Barron at home and told them to quit. (ECF No. 25 ¶ 34.)

12  Defendants Simmerson and McClellan did not intervene when correctional officers told Jones and

13  others "that they were 'fucking up' and that they 'were going to get fired.'" (ECF No. 25 ¶ 34.)

14  This conduct made Jones's "working conditions intolerable." (ECF No. 25 ¶ 34.)

15          In mid-2009, at the conclusion of a work shift Defendant Simmerson "warned

16  [Jones] to stay away from Lares." (ECF No. 25 ¶ 35.) When Jones questioned Simmerson,

17  Simmerson told him he would "go down as collateral damage" if he didn't stay away from Lares.

18  (ECF No. 25 ¶ 35.) Simmerson also told Jones "'we can burn people's fences.'" (ECF No. 25 ¶

19  35.) Jones told his wife he believed this was "in reference to an August 2001 criminal case in

20  which a [High Desert] correction officer set captain's fence on fire." (ECF No. 25 ¶ 35.) He also

21  told her he believe the threat was "another attempt to keep [Jones] from reporting officer

22  misconduct in Z-unit." (ECF No. 25 ¶ 35.) Defendant McClellan also warned Jones to stay away

23  from Lares or he would "go down with Officer Lares." (ECF No. 25 ¶ 36.)

24          As a result of all the harassment and abuse, Jones "sought medical treatment for

25  anxiety and depression" and was "prescribed anti-anxiety medication and anti-depressive

26  medications." (ECF No. 25 ¶ 37.) A few months later, Jones was threatened by Sergeant Amero,

27  who said that he had seen Jones walking with his family and "'thought about running [him] over

28  and making [him] a hood ornament.'" (ECF No. 25 ¶ 38.) The harassment and abuse "continued

throughout 2009." (ECF No. 25 ¶ 39.)  In August 2010, Lares sent a letter to the CDCR whistleblower hotline demanding protection for himself, Jones, Barron and Tirado.  (ECF No. 25 ¶ 40.)  In January 2011, Jones and Lares were transferred out of Z-unit to the A-yard to handle inmate mail.  (ECF No. 25 ¶ 41.)  They were warned by Sergeant Hayes "to be careful with the mail because [they] were going to be set up to be fired regarding their handling of the mail." (ECF No. 25 ¶ 41.)  For the next few months, Jones "experienced heightened scrutiny as to his job duties, especially as to the delivery of inmates' mail."  (ECF No. 25 ¶ 42.)

On July 4, 2011, Jones "responded to a medical incident on A yard" and grabbed the arm of an inmate who was falling, in order to break the inmate's fall.  (ECF No. 25 ¶ 43.) Later in the shift a correctional lieutenant told Jones he had heard Jones and other officers were "'taking inmates down . . . and beating the shit out of them.'"  (ECF No. 25 ¶ 43.)  Subsequently a "meritless investigation into alleged use of excessive force" by Jones was conducted.  (ECF No. 25 ¶ 43.)  The investigation was "obviously a ruse to intimidate [Jones], as the officers closest to the scene were not even interviewed."  (ECF No. 25 ¶ 43.)  The next day Jones was "repeatedly confronted" by a correctional counselor.  (ECF No. 25 ¶ 44.)  Later that day he spoke with his wife.  (ECF No. 25 ¶ 44.)  He was "extremely distraught" and told her he didn't think he could continue to work at High Desert.  (ECF No. 25 ¶ 44.)

On July 6, 2011, Jones called High Desert to quit.  (ECF No. 25 ¶ 45.)  The sergeant he spoke with told him "to take a short leave to consider his decision to quit."  (ECF No. 25 ¶ 45.)  On July 7, 2011, he received a call from another sergeant, with whom he "spoke for about an hour."  (ECF No. 25 ¶ 46.)  He told the sergeant about Simmerson ordering him to falsify the worker's compensation and the ensuing harassment and abuse.  (ECF No. 25 ¶ 46.) The sergeant told Jones to give the information to management at High Desert.  (ECF No. 25 ¶ 46.)  On July 8, 2011, Jones told his wife he was going to High Desert to talk with Defendants McDonald and Simmerson.  (ECF No. 25 ¶ 47.)  After she couldn't find Jones that afternoon, Plaintiff Janelle Jones and her father spent the rest of the day trying to find him.  (ECF No. 25 ¶ 48.)  Plaintiff Janelle Jones's father called Defendants McDonald and Simmerson and was told Jones hadn't "met with, or spoken to" either of them.  (ECF No. 25 ¶ 48.)

5

1    On July 9, 2011, Defendant Simmerson spoke with Plaintiff Janelle Jones's father

2  and asked if Jones had been found yet.   (ECF No. 25 ¶ 49.)  He also told Plaintiff Janelle Jones's

3  father he needed to know what Jones had been telling his wife about the prison.  (ECF No. 25 ¶

4  49.)  On the afternoon of July 9, 2011, Jones was found dead on a dirt road outside Susanville.

5  (ECF No. 25 ¶ 50.)  His truck was about two hundred yards from his body and several notes were

6  inside the car, including one that said "'The job made me do it.'"  (ECF No. 25 ¶ 50.)  Plaintiffs

7  are informed and believe that "no less than five correctional officers" from High Desert have

8  committed suicide in the past three years.  (ECF No. 25 ¶ 51.)

9    Plaintiffs' FAC contains five claims.  The first claim is raised against Defendants

10  McClellan and Simmerson for violation of Jones' rights under the First Amendment to be free

11  from harassment and retaliation.  (ECF No. 25 at 16–18.)  Plaintiffs' second claim is also against

12  Defendants McClellan and Simmerson for violation of Plaintiffs' Fourteenth Amendment rights

13  to the "companionship and support" of Jones.  (ECF No. 25 at 18–19.)[3]  The third claim is against

14  Defendants Cate and McDonald for failure to properly train and supervise correctional officers,

15  including Defendants McClellan and Simmerson.  (ECF No. 25 at 19–22.)  The fourth claim is a

16  state law claim for wrongful death raised against all Defendants.  (ECF No. 25 at 22–24.)  Finally,

17  the fifth claim is a state law claim for negligence against Defendants McDonald, McClellan, and

18  Simmerson.  (ECF No. 25 at 25.)

19    **II.    Standard of Law**

20    Federal Rule of Civil Procedure 12(c) provides "[a]fter the pleadings are closed—

21  but early enough not to delay trial—a party may move for judgment on the pleadings."  The issue

22  presented by a Rule 12(c) motion is the same as that posed in a 12(b) motion—whether the

23  allegations of the complaint, together with all reasonable inferences, state a plausible claim for

24  relief.  *See Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047 1054–1055 (9th Cir. 2011).  "A

25  claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

---

[3]    Plaintiffs cite both the Fourth and Fourteenth Amendments in their second claim for relief.  (ECF No. 25 ¶ 67.)  The substantive due process right to the companionship and society of family members arises under the Fourteenth Amendment.  *See Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008) (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) and *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998)).

1   the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

2   *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v.*

3   *Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)).

4          Nevertheless, a court "need not assume the truth of legal conclusions cast in the

5   form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n. 2 (9th

6   Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than

7   an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A

8   pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

9   elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678

10  ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

11  statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove

12  facts which it has not alleged or that the defendants have violated the ... laws in ways that have

13  not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,

14  459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

15         Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged

16  "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697

17  (quoting *Twombly*, 550 U.S. at 570). Only where a plaintiff has failed to "nudge [his or her]

18  claims across the line from conceivable to plausible," is the complaint properly dismissed. *Id.* at

19  680. While the plausibility requirement is not akin to a probability requirement, it demands more

20  than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. This plausibility

21  inquiry is "a context-specific task that requires the reviewing court to draw on its judicial

22  experience and common sense." *Id.* at 679.

23         If a complaint fails to state a plausible claim, "[c]ourts have discretion to grant

24  leave to amend in conjunction with 12(c) motions, and may dismiss causes of action rather than

25  grant judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 982 F. Supp. 1396, 1401 (N.D.

26  Cal. 1997) *aff'd*, 237 F.3d 1026 (9th Cir. 2001) (internal quotes omitted); *see also Dutciuc v.*

27  *Meritage Homes of Arizona, Inc.*, 462 F. App'x 658, 660 (9th Cir. 2011) (Although leave to

28  amend is often freely given when justice so requires, a district court may deny leave to amend

1   where a plaintiff has repeatedly failed to cure deficiencies by amendments previously allowed.");

2   *Longberg v. City of Riverside*, 300 F. Supp. 2d 942, 945 (C.D. Cal. 2004) ( "although Rule 12(c)

3   does not mention leave to amend, courts have discretion both to grant a Rule 12(c) motion with

4   leave to amend and to simply grant dismissal of the action instead of entry of judgment.").

5                    **III.    Analysis**

6                    Defendants contend that they are entitled to judgment on the pleadings on

7   Plaintiffs' first and third claims for relief because the alleged speech activities of Jones were not

8   protected by the First Amendment.  Defendants Cate and McDonald also seek judgment on the

9   pleadings on the third claim for relief on the ground that the allegations do not show they violated

10  Jones' First Amendment rights.  In addition, all Defendants contend they are entitled to qualified

11  immunity from liability on Plaintiffs' federal claims.  Finally, Defendants Cate and McDonald

12  contend they are entitled to judgment on the pleadings on Plaintiffs' state law claims because

13  Jones's suicide was an independent and intervening cause of death.  The Court addresses each

14  argument in turn.

15                   **A.  First Amendment Rights of Public Employees**

16                   Defendants seek dismissal of Plaintiffs' first claim for relief on the grounds that

17  none of Jones's speech activities were protected by the First Amendment, either because the

18  speech was  part of Jones's official duties as a correctional officer or because the speech did not

19  involve matters of public concern.  Plaintiffs contend that allegations within the FAC show that

20  Jones's speech did involve matters of public concern.  Plaintiffs also assert that the question of

21  whether Jones's speech activities were part of his official duties is a factual question not

22  susceptible to resolution on this motion for judgment on the pleadings.

23                   Public employees have First Amendment protection "from employment retaliation

24  for their protected speech activities."  *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068

25  (9th Cir. 2012) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L.Ed.2d 689

26  (2006) and *Connick v. Myers*, 461 U.S. 138, 140, 103 S. Ct. 1684, 75 L.Ed.2d 708 (1983)).  This

27  right is balanced against "'the State's interests as an employer in regulating the speech of its

28  employees, . . . .'"  *Karl*, 678 F.3d at 1068 (quoting *Connick*, 461 U.S. at 140).  To strike the

proper balance, when evaluating a retaliation claim raised by a public employee the court asks a series of questions:

> First, we consider whether the plaintiff has engaged in protected speech activities, which requires the plaintiff to show that the plaintiff: (1) spoke on a matter of public concern; and (2) spoke as a private citizen and not within the scope of her official duties as a public employee. If the plaintiff makes these two showings, we ask whether the plaintiff has further shown that she (3) suffered an adverse employment action, for which the plaintiff's protected speech was a substantial or motivating factor. If the plaintiff meets her burden on these first three steps, thereby stating a prima facie claim of First Amendment retaliation, then the burden shifts to the government to escape liability by establishing either that: (4) the state's legitimate administrative interests outweigh the employee's First Amendment rights; or (5) the state would have taken the adverse employment action even absent the protected speech.

*Karl*, 678 F.3d at 1068 (citations omitted).

The question of whether an employee spoke on a matter of public concern "is a pure question of law that must be determined 'by the content, form, and context of a given statement, as revealed by the whole record,'" with content "generally the most important" factor. *Id.* at 1069 (quoting *Connick*, 461 U.S. at 147–48 & n.7).

> "[S]peech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)). By contrast, "[s]peech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684).

*Karl*, 678 F.3d at 1069. "Subjects of public concern include 'unlawful conduct by a government employee' and the 'misuse of public funds, wastefulness, and inefficiency in managing and operating government entities.'" *Anthoine v. North Central Counties Consortium*, 605 F.3d 740, 748 (9th Cir. 2010) (internal citation omitted).

Plaintiffs allege that Jones was a corroborating witness to complaints of working conditions and safety violations at High Desert. (ECF No. 25 ¶ 30.) Plaintiffs also allege that Jones complained to his supervisors, including Defendant Simmerson, of "numerous events and

1  actions . . . that [he] believed violated federal or state law, or were violations or non-compliance

2  with a state or federal rule or regulation" including "(1) strip-searches of inmates in the snow; (2)

3  provocation of fighting among the inmates; (3) failure to permit inmates to shower; (4) failure to

4  exchange inmates' laundry; and (5) failure to prohibit inmates' possession and transmission of

5  contraband."  (ECF No. 25 ¶ 32.)  Under *Karl*, these are allegations of speech involving matters

6  of public concern.[4]

7        The question of whether an employee spoke as a private citizen and not within

8  official job duties is a mixed question of law and fact.  *See Ellins v. City of Sierra Madre*, 710

9  F.3d 1049, 1058 (9th Cir. 2013).  A public employee speaks as a private citizen when the speech

10 at issue is not part of the employee's official duty or tasks he or she is paid to perform.  *See id.*

11 The scope of an employee's job is a question of fact.  *See id.* (quoting *Robinson v. York*, 566 F.3d

12 817, 823 (9th Cir. 2009)).

13       The United States Court of Appeals for the Ninth Circuit has described three

14 factors relevant to determining whether a public employee's speech activities are part of official

15 duty and therefore outside the scope of First Amendment protection.  *Dahlia v. Rodriguez*, 735

16 F.3d 1060, 1074–75 (9th Cir. 2013).  The first factor, particularly relevant in the law enforcement

17 setting, is "whether or not the employee confined his communications to his chain of command."

18 *Id.* at 1074.  While this factor is "not necessarily dispositive," if a public employee speaks to

19 "individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant

20 to his duties." *Id.* (citing *Freitag v. Ayers*, 468 F.3d 528, 545-46 (9th Cir. 2006).  Second, "the

21 subject matter of the communication is . . . highly relevant."  *Dahlia*, 735 F.3d at 1074.  Routine

22 reports about particular incidents or occurrences are generally within a public employee's job

23 duties.  *Id.* at 1075.  "By contrast, if a public employee raises within the department broad

24 concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be

25 classified as being within the job duties of an average public employee, except when the

26  ─────────────

[4]      The FAC contains no allegations that suggest Jones was harassed for reporting that Defendant Simmerson
27  had forced him to file a false worker's compensation claim.  To the contrary, Plaintiffs allege that Jones was harassed
    and verbally abused to ensure his silence about the false worker's compensation claim, and that Jones did not tell
28  anyone at High Desert about the allegedly false claim until the day before his suicide.  (*See* ECF No. 25 ¶¶ 25–28,
    46.)

employee's regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another such watchdog unit." *Id.* Third, speech in contravention to direct orders often falls outside the scope of a public employee's duties. *Id.* "[T]he fact that an employee is threatened or harassed by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties notwithstanding any suggestions to the contrary in the employee's formal job description." *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (9th Cir. 2006)).

Defendants contend the FAC demonstrates that Jones was not speaking as a private citizen when he reported officer misconduct to his superiors at High Desert because it contains an allegation that officers were required to report misconduct as part of their official job duties. The FAC alleges generally that "[o]ne of the job duties of a correctional peace officer employed by the CDCR, as set forth in the CDCR's policies and procedures, especially the Operations Manual, was to disclose information regarding the wrongful and unlawful conduct of correctional peace officers." (ECF No. 25 ¶ 21.) *Dahlia* teaches that this general allegation is insufficient, without more, to resolve the factual question of whether Jones's alleged speech was part of his official duties and therefore outside the scope of First Amendment protection.

The second and third *Dahlia* factors weigh in favor of Plaintiffs on this issue. As discussed above, the allegations of the FAC concerning Jones's complaints about working conditions, safety violations and systemic abuse of inmates at High Desert all point to "broad concerns about corruption or systemic abuse." *Dahlia*, 735 F.3d at 1075. Moreover, the FAC alleges that Jones was threatened and harassed for this speech.

The close question on this motion concerns the first factor: to whom Jones made his complaints. Plaintiffs allege that Jones made his complaints of inmate abuse to his supervisors. (ECF No. 25 ¶ 32.) This allegation suggests that Jones's complaints were made within the chain of command. Plaintiffs also allege that Officer Lares made complaints, with Jones as a "corroborating witness," to "administration and management" at High Desert. (ECF No. 25 ¶ 30.) Prison administrators at a specific prison are generally considered to be within the "chain of command" at that prison for purposes of a First Amendment analysis. *See Freitag*, 468

11

1  F.3d at 546 (public employee's "internal reports of inmate sexual misconduct and documentation

2  of the prison's failure to respond" not protected by the First Amendment).

3          Plaintiffs also allege, however, that ultimately the harassment to which Jones was

4  subjected "became so great that the CDCR's whistleblower hotline was contacted."  (ECF No. 25

5  ¶ 40.)  The contact was through a letter by Officer Lares, who "demanded protection from the

6  administration at [High Desert] for himself, [Jones], Jesse Barron and Anthony Tirado."  (ECF

7  No. 25 ¶ 40.)  It appears to the Court that communication with the CDCR whistleblower hotline is

8  likely protected by the First Amendment; in any event, the question is a factual one not

9  susceptible of resolution on this motion for judgment on the pleadings.  *Cf. Freitag*, 468 F.3d at

10  546 (whether communication with CDCR director was protected by the First Amendment is

11  question of fact).[5]

12          At this stage of the proceedings, the Court is unable to conclude that the pleadings

13  establish that Jones's speech activities were all part of his official duties and therefore outside the

14  scope of First Amendment protection.  Resolution of that factual question must await a later stage

15  of these proceedings.  Therefore, the Court concludes that the foregoing reasons support that

16  Plaintiffs have adequately alleged that Jones engaged in speech activities involving matters of

17  public concern, and that the question of whether all of Jones's speech activities were exclusively

18  within the scope of his official duties is a factual question not susceptible to resolution on this

19  motion.  Accordingly, Defendants are not entitled to judgment as a matter of law on this claim.

20          **B.  Supervisory Liability**

21          Plaintiffs' third claim for relief against Defendants Cate and McDonald is that

22  these two Defendants failed to train and supervise correctional officers, especially Defendants

23  McClellan and Simmerson: (1) to ensure compliance with Peace Officer Standards and Training

24  requirements for CDCR officers; (2) regarding harassment of and retaliation against officers who

25  complain of working conditions and/or violations of state and federal law; (3) regarding

26  compliance with CDCR policies "regarding harassment, retaliation, conspiracy and falsifying

27  _____

[5]          The FAC alleges that Officer Lares wrote the letter to the CDCR whistleblower hotline, but the allegations

28  give rise to a reasonable inference that Jones was sufficiently involved with the letter for it to encompass his
protected speech activities.

1    reports"; and (4) that they failed to impose discipline for known past and ongoing violations or to

2    prevent future violations.  (*See* ECF No. 25 ¶¶ 72–76.)  As a result, Defendants Cate and

3    McDonald allegedly ratified and acquiesced in the constitutional violations allegedly suffered by

4    Jones.  (*See* ECF No. 25 ¶ 77.)

5            Defendants Cate and McDonald seek judgment as a matter of law on Plaintiffs'

6    third claim for relief.  Defendants contend the claim is based solely on a theory of *respondeat*

7    *superior*, which is not a permissible basis for liability in this § 1983 action.  Specifically,

8    Defendants contend: (1) Plaintiffs are required to, and have not, pleaded facts which show that

9    either Defendant Cate or Defendant McDonald were motivated by retaliatory intent; (2) Plaintiffs

10   have pleaded no facts which show that either Defendant Cate or Defendant McDonald personally

11   participated in the alleged deprivation of Jones' First Amendment rights; (3) Plaintiffs have

12   pleaded no facts which show either Defendant Cate or Defendant McDonald knew about the

13   alleged First Amendment violations and acquiesced in or approved of such violations; and (4)

14   Plaintiffs have failed to plead sufficient facts to support their failure to train theory of liability.

15   Plaintiffs contend (1) they are not required to plead retaliatory intent to support their claim against

16   these supervisor Defendants; and (2) the FAC adequately alleges that Defendants Cate and

17   McDonald were responsible for policies on harassment and retaliation against correctional

18   officers that were the moving forces of the violation of Jones' constitutional rights.

19           It is well-settled that:

20   A defendant may be held liable as a supervisor under §1983 "if
     there exists either (1) his or her personal involvement in the
21   constitutional deprivation, or (2) a sufficient causal connection
     between the supervisor's wrongful conduct and the constitutional
22   violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).
     "[A] plaintiff must show the supervisor breached a duty to plaintiff
23   which was the proximate cause of the injury.  The law clearly
     allows actions against supervisors under section 1983 as long as a
24   sufficient causal connection is present and the plaintiff was
     deprived under color of law of a federally secured right." *Redman*
25   *[v. County of San Diego]*, 942 F.2d [1435] at 1447 [(9th Cir. 1991)]
     (internal quotation marks omitted).
26
     "The requisite causal connection can be established ... by setting in
27   motion a series of acts by others," *id.* (alteration in original; internal
     quotation marks omitted), or by "knowingly refus[ing] to terminate
28   a series of acts by others, which [the supervisor] knew or

> reasonably should have known would cause others to inflict a
> constitutional injury," *Dubner v. City & Cnty. of San Francisco*,
> 266 F.3d 959, 968 (9th Cir. 2001).  "A supervisor can be liable in
> his individual capacity for his own culpable action or inaction in the
> training, supervision, or control of his subordinates; for his
> acquiescence in the constitutional deprivation; or for conduct that
> showed a reckless or callous indifference to the rights of others."
> *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)
> (internal alteration and quotation marks omitted).

*Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009),

the United States Supreme Court held that "constitutional tort claims against supervisory

defendants turn on the requirements of the particular claim—and, more specifically, on the state

of mind required by the particular claim—not on a generally applicable concept of supervisory

liability." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1071 (9th Cir. 2012).  Thus,

> [f]or an official to be liable for another actor's depriving a third
> party of his constitutional rights, that official must have at least the
> same level of intent as would be required if the official were
> directly to deprive the third part of his constitutional rights. *See*
> [*Iqbal*, 556 U.S. at 677.]  With this proviso, a supervisor can be
> held liable for the constitutional torts of his subordinates if "a
> sufficient causal connection between the supervisor's wrongful
> conduct and the constitutional violation" exists.

*Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012) (quoting *Starr*, 652 F.3d at 1207

(internal citation omitted)).  "Constitutional tort liability after *Iqbal* depends primarily on the

requisite mental state for the violation alleged."  *OSU*, 699 F.3d at 1071.

In *OSU*, the Ninth Circuit held that a supervisor's knowledge of and acquiescence

in a First Amendment free speech violation was sufficient to impose liability on the supervisor for

the constitutional tort.  The court gave two reasons for the holding:  first, that First Amendment

free speech claims do not require specific intention; and second, that United States Supreme

Court has "only in limited situations . . . found constitutional torts to require specific intent."  *Id.*

at 1074.  The three situations cited by the *OSU* court are "(1) due process claims for injuries

caused by a high-speed chase . . . (2) Eighth Amendment claims for injuries suffered during the

response to a prison disturbance . . . (3) and invidious discrimination under the Equal Protection

Clause and the First Amendment Free Exercise Clause."  *Id.*

The case at bar presents a fourth constitutional tort that includes a specific intent

14

requirement.  Success on a retaliation claim requires proof that retaliation for the exercise of protected conduct "was a 'substantial' or 'motivating' factor" in imposing adverse employment consequences.  *See Mt. Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).  Under *Iqbal* and its Ninth Circuit progeny, Plaintiffs must allege facts which suggest that Defendants Cate and McDonald had the intent necessary to support a retaliation claim when they allegedly failed to train correctional officers and acquiesced in retaliatory events of which they had knowledge.  There are no allegations in the FAC which suggest that either Defendant Cate or Defendant McDonald had the requisite animus in allegedly failing to train, investigate, or discipline officers.  For this reason, the third claim for relief must be dismissed.  It is not clear to the Court whether the deficiencies in this claim could be cured by amendment.  Accordingly, the Court will grant Plaintiffs leave to file a second amended complaint.

### C.  Qualified Immunity

Defendants contend they are entitled to qualified immunity on all of Plaintiffs' federal claims.

> "Qualified immunity shields public officials from civil damages for performance of discretionary functions.  It is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L.Ed.2d 411 (1985)) (emphasis omitted).  Under qualified immunity, an officer is protected from suit when he or she "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  The standard leaves "ample room for mistaken judgments." *Id.* at 343, 106 S.Ct. 1092.

*Lacey v. Maricopa County*, 649 F.3d 1118, 1130–31 (9th Cir. 2011).  The court conducts a two-part inquiry to determine whether Defendants are entitled to qualified immunity:

> First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).  [Footnote omitted.]  Second, we must ask "whether the

15

1
2
3
4
5

> right was clearly established." *Id.* A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. If we answer either of the two inquiries in the negative, then the officer's conduct is protected by qualified immunity. We have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818; *see also Mueller*, 576 F.3d at 993–94.

6     *Id.* at 1131.  The court looks at the state of the law at the time of the events complained of to

7     determine whether Defendants would have had "fair warning" that their alleged actions were

8     unconstitutional.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

9                               **1. Fourteenth Amendment**

10                  Defendants McClellan and Simmerson seek qualified immunity on Plaintiffs'

11    Fourteenth Amendment loss of companionship claim on the ground that their alleged conduct did

12    not violate clearly established federal law.  Defendants contend that at the time Jones suffered the

13    alleged harassment there was no clearly established law which would have put reasonable

14    correctional officers on notice that their conduct violated Plaintiffs' Fourteenth Amendment right

15    to companionship.

16                  The substantive due process provisions of the Fourteenth Amendment guarantee a

17    right to familial association and companionship.  *See Porter*, 546 F.3d  at 1136–37.  A state actor

18    violates this right when he or she causes the loss of association and companionship by acts or

19    omissions which "shock the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847–851

20    (1998).  "Conscience-shocking actions are those taken with (1) 'deliberate indifference' or (2) a

21    'purpose to harm ... unrelated to legitimate law enforcement objectives.' [*Porter*, 546 F.3d at

22    1137.]  The lower "deliberate indifference" standard applies to circumstances where 'actual

23    deliberation is practical.'" *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013)

24    (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  To meet the "shock the

25    conscience" standard by deliberate indifference, the defendant must "either consciously or

26    through complete[ ] indifference disregard[ ] the risk of an unjustified deprivation" of life or liberty.

27    *Tatum v. Moody*, 768 F.3d 806, 820–21 (9th Cir. 2014) (citing *Gantt v. City of Los Angeles*, 717

28    F.3d 702, 707 (9th Cir. 2013)).

16

1       Here, the FAC contains the following allegations of misconduct by Defendant

2    Simmerson toward Jones:  (1)  In 2006, he ordered Jones to file a false worker's compensation

3    claim, (ECF No. 25 ¶ 23); (2) during 2008 he and others "summarily dismissed" Jones'

4    complaints of officer misconduct, (ECF No. 25  ¶¶ 27, 32); (3) he failed to intervene when other

5    correctional officers told Jones he was "'fucking up" and was going to get fired, (ECF No. 25 ¶

6    34); and (4) in mid-2009 he told Jones to stay away from Lares or he would "go down as

7    collateral damage" and warned Jones that they could "burn people's fences," (ECF No. 25 ¶ 35).

8    Liberally construed, the FAC also alleges that Defendant Simmerson was one of Jones'

9    supervisors who failed to act on Jones' complaints of verbal harassment.  (*See* ECF No. 25 ¶¶ 23,

10   27.)

11      The FAC contains the following allegations of misconduct by Defendant

12   McClellan toward Jones:  (1) he "constantly" accused Jones of tampering with inmates' mail,

13   accusations which were deemed to be untrue, (ECF No. 25 ¶ 33); (2) he subjected Jones to "an

14   onslaught of harassment, including threats of discipline through letters of instruction, forced job

15   changes and even termination," (ECF No. 25 ¶ 33); (3) he failed to intervene when other

16   correctional officers told Jones he was "'fucking up" and was going to get fired, (ECF No. 25 ¶

17   34); and (4) he warned Jones to leave Z-unit because management was "going to take down

18   Officer Lares" and if Jones did not leave he would "go down with Officer Lares," (ECF No. 25 ¶

19   36).

20      Plaintiffs have not cited any case which suggests that the type of workplace

21   harassment to which Defendants McClellan and Simmerson allegedly subjected Jones would

22   shock the conscience in violation of the substantive due process clause of the Fourteenth

23   Amendment, nor has the Court found any case so holding.  For this reason, the Court finds that

24   the law in this area was not clearly established at the time of the events complained of and,

25   therefore, that Defendants McClellan and Simmerson are entitled to qualified immunity on

26   Plaintiffs' Fourteenth Amendment claim.

27   ///

28   ///

17

### 2.  First Amendment Retaliation

Defendants McClellan and Simmerson also contend they are entitled to qualified immunity on Plaintiffs' successor-in-interest retaliation claim.  This contention is without merit.  For the reasons set forth *supra*, Plaintiffs have stated a cognizable claim that Defendants McClellan and Simmerson violated Jones' constitutional rights by retaliating against him.  The relevant principles of law were clearly established at all times relevant to this action.  Defendants McClellan and Simmerson are not entitled to qualified immunity on this claim.

### 3.  Supervisory Liability

Defendants Cate and McDonald contend they are entitled to qualified immunity on the third claim for relief because Plaintiffs have failed to allege facts sufficient to state a claim for relief against them.  For the reasons set forth *supra*, this claim will be dismissed with leave to amend.  The Court will not reach the qualified immunity defense at this time.

### D.  State Law Claims

Defendants Cate and McDonald seek judgment on the pleadings on Plaintiffs' state law claims for wrongful death and negligence on the ground that Jones's suicide was an independent intervening cause of Jones's death.   Plaintiffs contend they "have alleged facts showing that the negligence of [D]efendants Cate and McDonald in failing to train, supervise and prevent unlawful retaliation, harassment and threats were a significant stressor in Decedent Jones'[s] life and such stressor caused Decedent to develop an uncontrollable impulse to commit suicide." (Pls. Opp'n., ECF No. 48 at 24.)[6]

Defendants contend, correctly, that both state law claims are premised on negligence as to these two Defendants.  (*See* ECF No. 25 ¶¶ 89, 94.)

> Under California law, "[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." *McGarry v. Sax*, 158 Cal. App. 4th 983, 994, 70 Cal. Rptr. 3d 519 (2008) (internal quotations omitted).

---

[6] The page number is that stamped by the Court's electronic case filing (ECF) system at the time of filing.

1    *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009).  The parties agree California law controls

2    as to whether suicide is an independent intervening cause that precludes negligence liability.

3    Under California law, suicide is an independent intervening cause of injury where the negligent

4    wrong only causes a mental condition in which the injured person is able to realize the nature of

5    the act of suicide and has the power to control it if he so desires, the act then becomes an

6    independent intervening force and the wrongdoer cannot be held liable for the death.  On the

7    other hand, if the negligent wrong causes mental illness which results in an uncontrollable

8    impulse to commit suicide, then the wrongdoer may be held liable for the death.  *Tate v.*

9    *Canonica*, 180 Cal. App. 2d 898, 915 (Cal.App.1.Dist. 1960).

10            Even viewed in the light most favorable to Plaintiffs, the allegations of the FAC

11   are insufficient to support a finding that Jones had an "uncontrollable impulse to commit suicide

12   at the time of his death."  *Id.*  Plaintiffs allege that at some point, apparently in 2009, Jones sought

13   treatment for anxiety and depression caused by the toll that the "persistent verbal abuse and

14   harassment" took on him, and that he was prescribed anti-anxiety medication and anti-

15   depressants.  (ECF No. 25 ¶¶ 35–36, 39.)  Jones continued to work at High Desert until July

16   2011.  A few days before his suicide he called High Desert to quit.  (ECF No. 25   ¶ 45.)  The

17   sergeant with whom he spoke told him "to take a short leave to consider his decision to quit."

18   (ECF No. 25 ¶ 45.)  Jones told his wife about the call and he was "still extremely distraught and

19   filled with despair." (ECF No. 25 ¶ 45.)  The next day Jones received a call from another

20   sergeant.  (ECF No. 25 ¶ 46.)  Jones spoke with him for about an hour and told him about the

21   alleged directive from Defendant Simmerson to falsify the worker's compensation claim and the

22   harassment and abuse that had followed.  (ECF No. 25 ¶ 46.)  The sergeant told Jones he would

23   provide that information to management at High Desert.  (ECF No. 25 ¶ 46.)  Jones told his wife

24   he was going to quit because he didn't want to return to work "and be labeled a 'rat'."  (ECF No.

25   25 ¶ 46.)  The next morning, Jones told his wife he was going to High Desert to talk with

26   Defendants McDonald and Simmerson.  (ECF No. 25 ¶ 47.)  He hugged and kissed his wife and

27   they said goodbye, and his wife had no indication that would be the last time she would see him.

28   (ECF No. 25 ¶ 47.)  Jones did not meet with Defendants McDonald or Simmerson that day.  (ECF

No. 25 ¶ 48.)  His body was discovered the next day, approximately two hundred yards from his truck on a dirt road outside Susanville, California.  (ECF No. 25 ¶ 50.)  Several short notes were discovered inside the truck.  (ECF No. 25 ¶ 50.)

None of the allegations in the FAC state or support an inference Jones was acting under an uncontrollable impulse when he committed suicide.  *See Tate*, 180 Cal. App. 2d at 918. Moreover, the allegations of events leading up to Jones' suicide set forth *supra* suggest that Jones "had the opportunity to appreciate the nature of his actions."  *Corales*, 567 F.3d at 573.  In particular, Jones had taken steps to quit his job at High Desert and had attributed the decision to the years of alleged abuse and harassment, and he wrote several notes to family members before committing suicide.  *See Corales*, 567 F.3d at 573 (record suggested decedent had opportunity to "appreciate the nature of his actions" where he attended classes after the alleged triggering event, spoke with his mother and another person, and wrote a detailed suicide note).  For this reason, Defendants Cate and McDonald are entitled to judgment as a matter of law on Plaintiffs' state law claims.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings (ECF No. 47) is GRANTED IN PART and DENIED IN PART.  It is hereby ORDERED AND ADJUDGED that

1. Defendants' motion is DENIED as to Plaintiffs' first amendment claims against Defendants Simmerson and McClellan;

2. Defendants' motion for qualified immunity as Plaintiffs' fourteenth amendment claim for loss of companionship is GRANTED;

3. Defendants' motion is GRANTED as to Plaintiffs' third claim for relief against Defendants Cate and McDonald with leave to amend;

4. Defendants' motion is GRANTED as to Plaintiffs' state law claims against Defendants Cate and McDonald; and

///

///

5.     Plaintiffs are granted twenty days from the date of this order in which to file and serve a second amended complaint.

IT IS SO ORDERED.

Dated:  March 26, 2015

Troy L. Nunley
United States District Judge