1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11    JANELLE JONES, et al.,                    No.  2:12-cv-2181 TLN CKD

12            Plaintiffs,

13    v.                                         **ORDER GRANTING IN PART AND
                                                 DENYING IN PART DEFENDANTS'
14    MATTHEW CATE, et al.,                      MOTION TO DISMISS AND DENYING
                                                 DEFENDANTS' MOTION TO STRIKE**
15            Defendants.

16

17            This matter is before the Court pursuant to Defendants Ed Simmerson ("Defendant

18    Simmerson"), John McClellan ("Defendant McClellan"), Mike McDonald ("Defendant

19    McDonald"), and Matthew Cate's ("Defendant Cate") Motion to Dismiss (ECF No. 62) and

20    Motion to Strike (ECF No. 64).  Plaintiffs oppose both of the Defendants' motions.  (Pls. Opp'ns.,

21    ECF No. 65, ECF No. 66.)  The Court has carefully considered the arguments presented by the

22    parties.  For the reasons set forth below, Defendants' Motion to Dismiss (ECF No. 62) is

23    GRANTED IN PART and DENIED IN PART and  Defendant's Motion to Strike (ECF No. 64) is

24    DENIED.

25        **I.    FACTUAL BACKGROUND**

26            Plaintiffs, the widow and son of Scott Jones ("Scott"), filed their original Complaint

27    against Defendants on August 21, 2012.  (Compl., ECF No. 1.)  The First Amended Complaint

28    ("FAC") was filed on March 22, 2013.  (FAC, ECF No. 25.)  Defendants filed a motion to seek

1  judgment on the pleadings.  (Defs.' Mot. J. Pleadings, ECF No. 47.)  The Court granted the

2  motion in part and denied it in part.  (ECF No. 57.)  The instant Second Amended Complaint

3  ("SAC") was filed on April 15, 2015.  (SAC, ECF No. 60.)  The SAC contains the following

4  allegations:

5       Scott and Plaintiff Janelle Jones ("Janelle") were married.  (ECF No. 60 at ¶ 22.)  On

6  February 15, 2001, they had a son, Plaintiff T.J. Jones.  (ECF No. 60 at ¶ 22.)  In July 2002, Scott

7  was hired by the California Department of Corrections and Rehabilitations ("CDCR") as a

8  correctional officer.  (ECF No. 60 at ¶ 23.)  He was assigned to work at High Desert State Prison

9  ("HDSP") in Susanville, California.  (ECF No. 60 at ¶ 23.)  Scott performed his job in a

10  satisfactory manner and had "outstanding performance evaluations and complimentary peer

11  reviews."  (ECF No. 60 at ¶ 23.)

12       In 2006, Scott was assigned to work in the Z-unit at HDSP.  (ECF No. 60 at ¶ 25.)  The Z-

13  unit "is a stand-alone administrative segregation unit housing the most dangerous inmates."  (ECF

14  No. 60 at ¶ 25.)  On or about August 13, 2006, Scott "suffered a right knee injury while horsing

15  around on duty in the Z-unit."  (ECF No. 60 at ¶ 26.)  He reported the injury to his supervisor,

16  Defendant Simmerson, stating that he had injured himself while engaging in horseplay with

17  another correctional officer who had just been promoted.  (ECF No. 60 at ¶ 26.)  Defendant

18  Simmerson ordered Scott to report the injury as an on-the-job worker's compensation injury.

19  (ECF No. 60 at ¶ 26.)  Scott told Defendant Simmerson that he did not want to falsify a worker's

20  compensation claim and that the incident had not happened the way Defendant Simmerson

21  wanted it reported.  (ECF No. 60 at ¶ 26.)  However, Defendant Simmerson allegedly ordered

22  him to submit the report as an on-the-job worker's compensation claim.  (ECF No. 60 at ¶ 26.)

23  Because Scott did not want to be insubordinate and because he felt "tremendous pressure from his

24  superior officer," Scott did what Defendant Simmerson ordered him to do.  (ECF No. 60 at ¶ 26.)

25  Scott thereafter went on a leave of absence until February 2007, when he was released to work.

26  (ECF No. 60 at 27.)

27       In March 2007, Scott was pepper-sprayed in the eyes at close range by another

28  correctional officer, Sergeant Derek Fletcher.  (ECF No. 60 at ¶ 28.)  The incident was witnessed

by a number of other correctional officers.  (ECF No. 60 at ¶ 28.)  When the witnesses and Scott questioned Fletcher about why he had pepper-sprayed Scott, "Sergeant Fletcher flippantly responded with words to the effect of 'Does that mean that you are going to rat me out now?'" (ECF No. 60 at ¶ 28.)  Scott told his wife he thought the incident was a warning "to *keep quiet* about the August 2006 incident involving his knee injury and Simmerson ordering him to falsify the cause of his injury on the workers compensation forms."  (ECF No. 60 at ¶ 28.)

In October 2007, Scott "had knee surgery and spent the next four months in post-operative rehabilitation."  (ECF No. 60 at ¶ 29.)  Following his return to work in January 2008, he was assigned to Fence Patrol.  (ECF No. 60 at ¶ 30.)  Scott was allegedly subjected to "constant 'verbal harassment' by other correctional officers.  (ECF No. 60 at ¶ 30.)  Scott reported the harassment to his superiors at HDSP but nothing was done about it.  (ECF No. 60 at ¶ 30.)  He was also subjected to "two 'random' drug tests," which had never been required before.  (ECF No. 60 at ¶ 31.)

Scott was subsequently reassigned to the Z-unit, where he worked with three other correctional officers, Anthony Lares ("Lares"), Jess Barron ("Barron"), and Anthony Tirado ("Tirado").  (ECF No. 60 at ¶ 32.)  For the rest of his employment with CDCR, Scott was often partnered with Lares.  (ECF No. 60 at ¶ 32.)  Lares "filed several verbal and written complaints." (ECF No. 60 at ¶ 33.)  Lares complained that the work environment created by Lieutenant Amero was intimidating and hostile.  (ECF No. 60 at ¶ 33.)  He also complained that the transportation vehicle in the Z-unit was inadequate and that Lares, Scott, and Barron's trucks were vandalized. (ECF No. 60 at ¶ 33.)  The first two complaints were submitted directly to Defendant McDonald, and included grievances about Scott being subjected to threats, as well as a hostile work environment.  (ECF No. 60 at ¶ 33.)  Lares requested an administrative investigation, but Defendant McDonald did not grant the request.  (ECF No. 60 at ¶ 33.)  (ECF No. 60 at ¶ 33.)

While working in the Z-unit, Scott "witnessed and complained of numerous events and actions to his supervisors, including but not limited to Defendant Simmerson, that [Scott] believed violated federal or state law" and/or rules and regulations.  (ECF No. 60 at ¶ 37.)

In particular, [Scott] witnessed and complained of: (1) strip-

3

searches of inmates in the snow; (2) provocation of fighting among the inmates; (3) failure to permit inmates to shower; (4) failure to exchange inmates' laundry; and (5) failure to prohibit inmates' possession and transmission of contraband.

(ECF No. 60 at ¶ 37.)  All of the reports were "summarily dismissed," and Scott decided it would be futile to report any more misconduct.  (ECF No. 60 at ¶ 37.)

In addition to not responding to his complaints, Scott's supervisors "falsely accused [him] of misconduct."  (ECF No. 60 at ¶ 38.)  Defendant McClellan "constantly" accused Scott, Lares, and Barron of tampering with inmates' mail and the three were threatened with discipline and termination.  (ECF No. 60 at ¶ 38.)  The accusations were investigated and found to be untrue, but Defendant McClellan allegedly continued the harassment.  (ECF No. 60 at ¶ 38.)  Defendant Simmerson called Scott and Barron at home and told them to quit.  (ECF No. 60 at ¶ 39.)  Defendants Simmerson and McClellan did not intervene when correctional officers told Scott and others "that they were 'fucking up' and that they 'were going to get fired.'"  (ECF No. 60 at ¶ 39.)  Plaintiffs assert that this conduct made Scott's "working conditions intolerable."  (ECF No. 60 at ¶ 39.)

In mid-2009, at the conclusion of a work shift Defendant Simmerson "warned [Scott] to stay away from Lares."  (ECF No. 60 at ¶ 40.)  When Scott questioned him, Simmerson told Scott that he would "go down as collateral damage" if he didn't stay away from Lares.  (ECF No. 60 at ¶ 40.)  Simmerson also told Scott "'we can burn people's fences.'"  (ECF No. 60 at ¶ 40.)  Scott told his wife he believed this was "in reference to an August 2001 criminal case in which a [HDSP] correctional officer set a captain's fence on fire."  (ECF No. 60 at ¶ 40.)  He also told her he believed the threat was "another attempt to keep [Scott] from reporting officer misconduct in Z-unit."  (ECF No. 60 at ¶ 40.)  Defendant McClellan also warned Scott to stay away from Lares or he would "go down with Officer Lares."  (ECF No. 60 at ¶ 41.)

As a result of all the harassment and abuse, Scott "sought medical treatment for anxiety and depression" and was "prescribed anti-anxiety medication and anti-depressive medications."  (ECF No. 60 at ¶ 42.)  A few months later, Scott was threatened by Sergeant Amero, who said that he had seen Scott walking with his family and "'thought about running [him] over and

4

1    making [him] a hood ornament.'"  (ECF No. 60 at ¶ 43.)  The harassment and abuse "continued

2    throughout 2009."  (ECF No. 60 at ¶ 44.)

3         In August 2010, Lares sent a letter to the CDCR whistleblower hotline demanding

4    protection for himself, Scott, Barron and Tirado.  (ECF No. 60 at ¶ 45.)  In January 2011, Scott

5    and Lares were transferred out of the Z-unit to the A-yard to handle inmate mail.  (ECF No. 60 at

6    ¶ 46.)  They were warned by Sergeant Hayes "to be careful with the mail because [they] were

7    going to get set up to be fired regarding their handling of the mail."  (ECF No. 60 at ¶ 46.)  For

8    the next few months, Scott "experienced heightened scrutiny as to his job duties, especially as to

9    the delivery of inmates' mail."  (ECF No. 60 at ¶ 47.)

10        On July 4, 2011, Scott "responded to a medical incident on A yard" and grabbed the arm

11   of an inmate who was falling, in order to break the inmate's fall.  (ECF No. 60 at ¶ 48.)  Later in

12   his shift, a correctional lieutenant told Scott he had heard Scott and other officers were "'taking

13   inmates down … and beating the shit out of them.'"  (ECF No. 60 at ¶ 48.)  Subsequently a

14   "meritless investigation into [Scott's] alleged use of excessive force" by Scott was conducted.

15   (ECF No. 60 at ¶ 48.)  The investigation was "obviously a ruse to intimidate [Scott], as the

16   officers closest to the scene were not even interviewed."  (ECF No. 60 at ¶ 48.)  The next day

17   Scott was "repeatedly confronted" by a correctional counselor.  (ECF No. 60 at ¶ 49.)  Later that

18   day, Scott spoke with his wife and was "extremely distraught."  (ECF No. 60 at ¶ 49.)  Scott told

19   her he did not think he could continue to work at HDSP.  (ECF No. 60 at ¶ 49.)

20        On July 6, 2011, Scott called HDSP to quit.  (ECF No. 60 at ¶ 50.)  The sergeant he spoke

21   with told him "to take a short leave to consider his decision to quit."  (ECF No. 60 at ¶ 50.)  On

22   July 7, 2011, Scott received a call from another sergeant, with whom he "spoke for about an

23   hour."  (ECF No. 60 at ¶ 51.)  He told the sergeant about Simmerson ordering him to falsify the

24   worker's compensation, and the ensuing harassment and abuse.  (ECF No. 60 at ¶ 51.)  The

25   sergeant told Scott to give the information to management at HDSP.  (ECF No. 60 at ¶ 51.)  On

26   July 8, 2011, Scott told his wife he was going to HDSP to talk with Defendants McDonald and

27   Simmerson.  (ECF No. 60 at ¶ 52.)  When Scott did not return that afternoon, Janelle and her

28   father spent the rest of the day trying to find him.  (ECF No. 60 at ¶ 53.)  Janelle's father called

1  Defendants McDonald and Simmerson and was told that Scott had not "met with, or spoken to"

2  either of them.  (ECF No. 60 at ¶ 53.)

3        On July 9, 2011, Defendant Simmerson spoke with Janelle's father and asked if Scott had

4  been found.  (ECF No. 60 at ¶ 54.)  He asked Janelle's father what Scott had been telling his wife

5  about the prison.  (ECF No. 60 at ¶ 54.)  On the afternoon of July 9, 2011, Scott was found dead

6  on a dirt road outside of Susanville.  (ECF No. 60 at ¶ 55.)  His truck was about two hundred

7  yards from his body and several notes were inside the car, including one that said "'The job made

8  me do it.'"  (ECF No. 60 at ¶ 55.)  Plaintiffs are informed and believe that "no less than five

9  correctional officers" from HDSP have committed suicide in the past three years.  (ECF No. 60 at

10  ¶ 56.)

11       **II.**    **STANDARD OF LAW**

12          1.  <u>Motion to Dismiss</u>

13        FRCP 8(a) requires that a pleading contain "a short and plain statement of the claim

14  showing that the pleader is entitled to relief."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79

15  (2009).  Under notice pleading in federal court, the complaint must "give the defendant fair notice

16  of what the claim . . . is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S.

17  544, 555 (2007) (internal quotations omitted).  "This simplified notice pleading standard relies on

18  liberal discovery rules and summary judgment motions to define disputed facts and issues and to

19  dispose of unmeritorious claims."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

20        On a motion to dismiss, the factual allegations of the complaint must be accepted as true.

21  *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  A court is bound to give plaintiff the benefit of every

22  reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *Retail*

23  *Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege

24  "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to

25  relief."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads

26  factual content that allows the court to draw the reasonable inference that the defendant is liable

27  for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. 544, 556 (2007)).

28        Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of

factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged[.]" *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 697 (quoting *Twombly*, 550 U.S. at 570).  Only where a plaintiff fails to "nudge[] [his or her] claims . . . across the line from conceivable to plausible[,]" is the complaint properly dismissed.  *Id.* at 680.  While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully."  *Id.* at 678.  This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In ruling upon a motion to dismiss, the court may consider only the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201.  *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

If a complaint fails to state a plausible claim, "'[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'"  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995)); *see also Gardner v. Marino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in

7

1    denying leave to amend when amendment would be futile).  Although a district court should

2    freely give leave to amend when justice so requires under Rule 15(a)(2), "the court's discretion to

3    deny such leave is 'particularly broad' where the plaintiff has previously amended its

4    complaint[.]"  *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir.

5    2013) (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004)).

6                                2.   <u>Motion to Strike</u>

7            Federal Rule of Civil Procedure (FRCP) 12(f) provides that a court "may strike from a

8    pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

9    A court will only consider striking a defense or allegation if it fits within one of these five

10   categories.  *Yursik v. Inland Crop Dusters Inc.,* No. CV–F–11–01602–LJO–JLT, 2011 WL

11   5592888, at *3 (E.D. Cal. Nov. 16, 2011) (citing *Whittlestone, Inc. v. Handi–Craft Co.,* 618 F.3d

12   970, 973–74 (9th Cir. 2010)).  "[T]he function of a 12(f) motion to strike is to avoid the

13   expenditure of time and money that must arise from litigating spurious issues by dispensing with

14   those issues prior to trial."  *Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885 (9th Cir.

15   1983).  However, Rule 12(f) motions are "generally regarded with disfavor because of the limited

16   importance of pleading in federal practice, and because they are often used as a delaying

17   tactic."  *Neilson v. Union Bank of Cal., N.A.,* 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003).

18   "Ultimately, whether to grant a motion to strike lies within the sound discretion of the district

19   court."  *Id.*  Unless it would prejudice the opposing party, courts freely grant leave to amend

20   stricken pleadings.  *Wyshak v. City Nat'l Bank,* 607 F.2d 824, 826 (9th Cir. 1979); *see also* Fed.

21   R. Civ. P. 15(a)(2).  If the court is in doubt as to whether the challenged matter may raise an issue

22   of fact or law, the motion to strike should be denied, leaving the assessment of the sufficiency of

23   the allegations for adjudication on the merits after proper development of the factual nature of the

24   claims through discovery.  *See generally Whittlestone,* 618 F.3d at 974–75.

25           Where a defendant seeks to challenge the sufficiency of factual allegations in a complaint,

26   it must do so through a Rule 12(b)(6) motion, not a Rule 12(f) motion.  *Kelley v. Corr. Corp. of*

27   *Am.,* 750 F. Supp. 2d 1132, 1146 (E.D. Cal. 2010) (citing *Consumer Solutions REO, LLC v.*

28   *Hillery,* 658 F. Supp. 2d 1002, 1020 (N.D. Cal. 2009)).  "[W]here a motion is in substance a Rule

                                           8

12(b)(6)motion, but is incorrectly denominated as a Rule 12(f) motion, a court may convert the improperly designated 12(f) motion into a Rule 12(b)(6) motion." *Id.* (citing *Consumer Solutions,* 658 F. Supp. 2d at 1021).

### III.   ANALYSIS

Plaintiffs' SAC contains four claims.  The first claim is against Defendant McClellan and Simmerson for violation of Scott' rights under the First Amendment to be free from harassment and retaliation.  (ECF No. 60 at ¶¶ 66–71.)  Plaintiffs' second claim is against Defendants Cate and McDonald for failure to properly train and supervise correctional officers, including Defendants McClellan and Simmerson.  (ECF No. 60 at ¶¶ 72–87.)  The third claim is a state law claim for wrongful death against Defendants McClellan and Simmerson.  (ECF No. 60 at ¶¶ 88–96.)  Finally, the fourth claim is a state law claim for negligence against Defendants McClellan and Simmerson.  (ECF No. 60 at ¶¶ 97–102.)

### A.   Motion to Dismiss

Defendants have moved to dismiss Plaintiffs' Second, Third, and Fourth Causes of Action.  The Court addresses each of these claims in turn.

#### i.   Count II: Violation of 42 U.S.C. § 1983 Supervisory Liability against Defendants Cate and McDonald[1]

In Plaintiffs' previous complaint (the FAC), they asserted a supervisory claim against Defendants Cate and McDonald for failure to train, supervise, and discipline CDCR officers for First Amendment retaliation under 42 U.S.C. § 1983.  (ECF No. 25 at ¶¶ 72–79.)  The Court dismissed the claim because the FAC lacked allegations that either Defendant Cate or Defendant McDonald had the requisite animus.  (ECF No. 57 at 15.)

Plaintiffs renew their claims against Defendants McDonald and Cate in the SAC.  In the SAC, Plaintiffs assert that despite being aware of Lares and Scott's complaints, neither Defendant

---

[1] In its previous order, the Court determined that, in Count I, Plaintiffs adequately alleged that Scott engaged in speech activities involving matters of public concern and that the question of whether all of Scott's speech activities were exclusively within the scope of his official duties is a factual question not susceptible to resolution at the pleadings stage.  (ECF No. 57 at 12.)  Therefore, Plaintiffs at this point have alleged sufficient facts to sustain their claim against Defendants McClellan and Simmerson for violations of 42 U.S.C. § 1983, Scott's right to be free from harassment and retaliation for exercising his right of freedom of speech under Count I.  His claim in Count II involves supervisory liability for the same First Amendment claim.

1   McDonald nor Defendant Cate took action to (1) thoroughly investigate those complaints, (2)

2   meaningfully address those complaints, or (3) take any action to prevent further instances of such

3   complained actions.  (ECF No. 60 at ¶ 73.)  More specifically, Plaintiffs allege that Defendants

4   Cate and McDonald implemented unconstitutional policies and turned a blind eye to the

5   unconstitutional abuses Scott suffered by failing to properly train, assign, supervise, oversee and

6   discipline CDCR officers, especially Defendants McClellan and Simmerson.  (ECF No. 60 at ¶

7   75.)  Plaintiffs also allege that Defendants either participated in, knew of, or of should have

8   known of their subordinates' unconstitutional abuses, harassment, retaliation, conspiracy,

9   falsification of reports, and/or noncompliance with CDCR's policies.  (ECF No. 60 at ¶ 76.)

10          "Supervisors can be held liable for: 1) their own culpable action or inaction in the

11  training, supervision, or control of subordinates; 2) their acquiescence in the constitutional

12  deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous

13  indifference to the rights of others." *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

14  For an official to be liable for another's deprivation of a third party's constitutional rights, "that

15  official must have at least the same level of intent as would be required if the official were

16  directly to deprive the third party of his constitutional rights." *Lacey v. Maricopa Cnty.*, 693 F.3d

17  896, 916 (9th Cir. 2012).  A plaintiff must also show that the supervisor had the requisite animus

18  to establish liability.  *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1071 (9th Cir. 2012).  The

19  constitutional provision at issue, the First Amendment, requires proof that retaliation for the

20  exercise of protected conduct "was a 'substantial' or 'motivating' factor" in imposing adverse

21  employment consequences.  *See Mt. Health City School District Board of Education v. Doyle*,

22  429 U.S. 274, 287 (1977).

23          Defendants move for dismissal alleging that Plaintiffs fail to present facts showing that

24  Defendant Cate or McDonald: (1) acted with retaliatory animus; (2) knowingly acquiesced in

25  subordinates' retaliatory harassment with the intent to deter or punish speech; or (3) knowingly

26  failed to train, supervise, or discipline subordinate employees regarding retaliatory harassment

27  with the intent to deter or punish speech.  (ECF No. 62 at 8–16.)  Because retaliatory animus is

28  required as to all three theories of liability, the Court addresses this factor as to both Defendants

1   first.  The Court then turns to Defendants' allegations concerning whether Plaintiffs have alleged

2   facts to support liability, i.e. whether Plaintiffs have alleged that Defendants knowingly

3   acquiesced in subordinates' retaliatory harassment; or that Defendants knowingly failed to train,

4   supervise, or discipline subordinate employees.

5                              a.  Retaliatory Animus

6          In its previous order, the Court found that the FAC did not allege facts that supported

7   Plaintiffs' position that Defendants Cate and McDonald had the intent necessary to support a

8   retaliation claim.  (ECF No. 57 at 15.)  While, the FAC and the SAC complaint are factually

9   similar, the Court finds that Plaintiffs have alleged more facts in order to show that Defendant

10  McDonald had the requisite intent.  However, as explained below, the Court does not find that

11  Plaintiffs have pleaded sufficient facts to show Defendant Cate had the requisite intent.  The

12  Court addresses each Defendant separately.

13                      **1.  Defendant McDonald**

14         Defendants allege that there are no facts in the complaint that show Defendant McDonald

15  had any knowledge that Scott engaged in protected activity himself.  (ECF No. 62 at 11.)

16  Plaintiffs argue that Lares's multiple memoranda involving Scott, were submitted to McDonald

17  by Scott's co-worker, and that this demonstrates that Defendant McDonald had knowledge of

18  Scott's protected activity.  (ECF No. 65 at 13–14.)  This Court agrees.

19         When proving a supervisor has the requisite retaliatory intent, plaintiffs can use either

20  direct or circumstantial evidence.  *Ulrich v. City & Cnty. Of San Francisco*, 308 F.3d 968, 979

21  (9th Cir. 2002).  Plaintiffs need not prove their case at this point, but simply need to show

22  plausibility of their claim.  *Iqbal*, 556 U.S. at 697.

23         In Plaintiffs' SAC, there are facts suggesting that Defendant McDonald was aware of the

24  complaints filed by Lares, which mentioned Scott.  (ECF No. 60 at ¶ 33.)  For example, not only

25  did Lares's complaints include Scott in every filing, they were directly submitted to Defendant

26  McDonald.  (ECF No. 60 at ¶ 33.)  Therefore, Defendant McDonald would have or should have

27  known of the harassment involving Scott.  Furthermore, Lares requested administrative

28  investigation of vandalism, but Defendant McDonald ignored such request.  (ECF No. 60 at ¶ 33.)

11

1    This suggests that even though Defendant McDonald was aware and was requested to respond to

2    a particular complaint, he ignored the request and chose not to address the issues.  It can therefore

3    be inferred that Defendant McDonald's inaction was in retaliation to the multiple complaints filed

4    involving Lares and Scott.  These allegations are sufficient to show Defendant McDonald acted

5    with a retaliatory animus towards Scott, and thus Plaintiffs have alleged facts that show the

6    plausibility of their claim against Defendant McDonald.

7                                    **2.  Defendant Cate**

8            Defendants allege that Plaintiffs fail to show that Defendant Cate acted with retaliatory

9    animus to be liable for First Amendment retaliation.  (ECF No. 62 at 9–11.)  Plaintiffs argue that

10   they are not required to plead specific intent in order to impose supervisory liability.  (ECF No.

11   65 at 18.)  Plaintiffs erroneously cite to the dissent of a Ninth Circuit case in support of its claim.

12   (ECF No. 65 at 19.)  Plaintiffs misstate the law.  *See Lacey v. Maricopa County*, 693 F.3d 896,

13   916 (9th Cir. 2012) ("For an official to be liable for another actor's depriving a third party of his

14   constitutional rights, that official must have at least the same level of intent as would be required

15   if the official were directly to deprive the third part of his constitutional rights."); *OSU Student*

16   *Alliance v. Ray*, 699 F.3d 1053, 1071 (9th Cir. 2012) ("Constitutional tort liability after Iqbal

17   depends primarily on the requisite mental state for the violation alleged.").

18           Based on the facts alleged in the SAC, there is no indication that Defendant Cate even

19   knew who Scott was.  None of the complaints that Lares filed were sent directly to Defendant

20   Cate.  Plaintiffs have not alleged sufficient facts to show that Cate knew or should have known of

21   Scott or his situation.  Thus, Plaintiffs have not alleged facts to support their position that Cate

22   had constructive knowledge of the numerous complaints in order to create a retaliatory animus

23   towards Scott.  While Plaintiffs argue that Defendant Cate should have been on notice of the

24   unlawful free speech retaliations and harassment based on prior incidents and suicides at HDSP in

25   the past three years, they fail to allege how any of these events are similar to the instant matter.

26   Without understanding the nature of these events, and with Defendant Cate so far removed as a

27   Director of the CDCR, there are no facts that suggest that Defendant Cate would have knowledge

28   of Scott's complaints or that Defendant Cate would have the retaliatory animus towards Scott.

1    Thus, Defendants' Motion to Dismiss Count II against Defendant Cate is granted.

2                    b.   Theories of Liability for a Supervisory Claim (Acquiescence and

3                         Failure to Train)

4         Because the First Amendment retaliation claim against Defendant Cate is dismissed for

5    lack of retaliatory animus, the Court addresses Defendants' remaining concerns only with regards

6    to Defendant McDonald.  The Court construes Plaintiffs' SAC to allege that Defendant

7    McDonald should be held liable under two supervisory theories:  First, for his "own culpable

8    action or inaction in the training, supervision, or control of subordinates" and second, for conduct

9    that showed a reckless or callous indifference to the rights of others."  *Gates*, 229 F.3d at 1292.

10   The Court finds that Plaintiff alleges sufficient facts to address the first theory of liability and

11   therefore does not address Plaintiffs' second theory.

12        Defendants allege that the SAC remains defective because there are no facts that allege

13   that Defendant McDonald: (1) knew that subordinate officers were violating Scott's First

14   Amendment rights; (2) knowing such facts, acquiesced or approved their subordinates' retaliatory

15   conduct in an effort to inhibit or punish speech by Scott (ECF No. 62 at 14); and/or (3) knew that

16   the training or discipline at HDSP was so deficient that it was likely to result in a violation of

17   Scott's First Amendment rights.  (ECF No. 62 at 15).

18        First, the Court cannot agree with Defendant's first allegation that Defendant McDonald

19   did not know subordinates were violating Scott's First Amendment rights.  The SAC makes clear

20   that Defendant McDonald should have known that subordinates were harassing Scott and creating

21   a hostile work environment because multiple verbal and written complaints were filed directly

22   with Defendant McDonald.  (ECF No. 60 at ¶ 33.)

23        In regards to Defendants' second allegation—that Plaintiffs have not shown that

24   McDonald acquiesced or approved their subordinates' retaliatory conduct in an effort to inhibit or

25   punish speech by Scott —it is not necessary for Plaintiffs to allege such facts because Plaintiffs

26   bring their supervisory claim under a different theory of supervisory liability, i.e. a failure to

27   supervise, instruct, or control subordinates, and reckless or callous indifference to rights of others.

28   (ECF No. 60 at ¶ 80.)  Plaintiffs are not required to satisfy all three possible theories of

1    supervisory liability.  Therefore, this claim is meritless.

2          With regards to Defendants' third concern, Plaintiffs have alleged sufficient facts to bring

3    a claim against Defendant McDonald under the failure to train, supervise, or control theory.  The

4    filing of Lares's complaints on his and Scott's behalves establishes the causal connection

5    required.  Plaintiffs need only allege facts that show Defendant McDonald knew the subordinates

6    were engaging in acts that inflicted constitutional harms—which they did because the complaints

7    were filed directly with Defendant McDonald—and that he failed to act to prevent the harms by

8    ignoring requests for an administrative investigation.  *See Preschooler II v. Clark County Sch. Bd.*

9    *Of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743

10   (9th Cir. 1978) ("The requisite causal connection may be established when an official sets in

11   motion a 'series of acts by others which the actor knows or reasonably should know would cause

12   others to inflict' constitutional harms.").  Therefore, Plaintiffs have alleged sufficient facts to

13   have a supervisory claim at this stage of the litigation.  479 F.3d at 1182.

14                    c.   Qualified Immunity for Defendant McDonald

15         Defendant McDonald seeks qualified immunity on Plaintiffs' First Amendment retaliation

16   claim.  (ECF No. 62 at 16.)  Defendants contend that the SAC fails to allege facts that show

17   Defendant McDonald participated in conduct that violated Scott's First Amendment rights.  (ECF

18   No. 62 at 16.)  In response Plaintiffs argue they have alleged facts showing that Defendant

19   McDonald failed to correct the constitutional violations of his subordinates after becoming aware

20   of them, and created a policy under which the constitutional violations occurred or were allowed

21   to continue.  (ECF No. 65 at 21.)   For the reasons below, the Court finds that qualified immunity

22   does not apply.

23         "Qualified immunity balances ... the need to hold public officials accountable when they

24   exercise power irresponsibly and the need to shield officials from harassment, distraction, and

25   liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231

26   (2009).  The doctrine of qualified immunity insulates government officials from civil damages in

27   § 1983 litigation "insofar as their conduct does not violate clearly established statutory or

28   constitutional rights of which a reasonable person would have known." *Id.* at 231 (citing *Harlow*

                                                    14

1  *v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is an affirmative defense; the

2  burden of pleading it rests with the defendant.  *Crawford-El v. Britton*, 523 U.S. 574, 586–87,

3  (1998) (citing *Gomez v. Toledo*, 446 U.S. 635, 639–41, (1980)).  Furthermore, because qualified

4  immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost

5  if a case is erroneously permitted to go to trial."  *Pearson*, 555 U.S. at 231 (citing *Mitchell v.*

6  *Forsyth*, 472 U.S. 511, 526, (1985)).  Accordingly, the Supreme Court has repeatedly stressed the

7  importance of resolving immunity questions at the earliest possible stage in litigation.  *Id.* at 233–

8  34 ("Because qualified immunity protects government officials from suit as well as from liability,

9  it is essential that qualified immunity claims be resolved at the earliest possible stage of

10  litigation.") (citing *Forsyth*, 472 U.S. at 526).

11         The determination of qualified immunity requires a two-step inquiry into: (1) whether

12  facts alleged, taken in the light most favorable to the injured party, show the defendants' conduct

13  violated a constitutional right; and (2) whether the right was clearly established.  *Lacey*, 693 F.3d

14  at 915.  The first prong of the qualified immunity analysis is distinct from the inquiry on the

15  merits of the constitutional violation.  *Saucier v. Katz*, 533 U.S. 194, 201, (2001); *see also*

16  *Forsyth*, 472 U.S. at 527–28 (1985) ("A claim of immunity is conceptually distinct from the

17  merits of the Plaintiff's claim that his rights have been violated.").

18         Taken in the light most favorable to Plaintiffs, the SAC alleges sufficient facts to find that

19  Defendant McDonald failed to correct the constitutional violations of his subordinates after

20  becoming aware of them.  For example, the SAC contains allegations of misconduct by

21  Defendant McDonald's subordinates and alleges that multiple complaints were filed directly with

22  Defendant McDonald.  (ECF No. 60 at ¶ 33.)  Despite knowledge of the harassment and hostile

23  work environment created by the subordinates and a request for administrative investigation,

24  Defendant McDonald allegedly chose to do nothing.  (ECF No. 60 at ¶ 33.)  Therefore, Plaintiffs

25  have stated a cognizable claim that Defendant McDonald violated Scott's constitutional rights by

26  retaliating against him.

27         As to the second inquiry, the relevant principals of law were clearly established at all

28  times to this action.  Public employees have First Amendment protection "from employment

15

1   retaliation for their protected speech activities." *Karl v. City of Mountlake Terrace*, 678 F.3d

2   1062, 1068 (9th Cir. 2012) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) and *Connick v.*

3   *Myers*, 461 U.S. 138, 140, (1983)).  Therefore, Defendant McDonald is not entitled to qualified

4   immunity on this claim.[2]

5            ii.   *Counts III and IV: State Law Claims for Wrongful Death and Negligence*

6            In their FAC, Plaintiffs brought the same wrongful death and negligence claims against

7   Defendants Cate, McDonald, Simmerson, and McClellan.  (ECF No. 25 at ¶¶ 80–96.)  Defendants

8   filed a motion seeking judgment on the pleadings to dismiss Counts III and IV as to only

9   Defendants Cate and McDonald.  (ECF No. 47.)  This Court ruled that Scott had the opportunity

10   to appreciate the nature of his actions, and therefore, the state law claims against Defendants

11   McDonald and Cate for wrongful death and negligence were dismissed as a matter of law.  (ECF

12   No. 57 at 20.)

13            In their SAC, Plaintiffs bring the same state claims of wrongful death and negligence

14   against the remaining Defendants Simmerson and McClellan.  (ECF No. 60 at ¶¶ 88–102.)

15   Defendants again move to dismiss the state law claims of wrongful death and negligence because

16   Scott's suicide was an independent intervening cause of his death.  (ECF No. 62 at 16.)  Plaintiffs

17   contend that Defendants Simmerson and McClellan's negligence caused Scott to suffer a mental

18   condition in which he could not control his suicidal impulses.  (ECF No. 65 at 22.)  For the

19   following reasons, the Court finds that the rationale stated in its previous order applies to

20   Plaintiffs claims against Defendants Simmerson and McClellan.  As such, these claims must be

21   dismissed.

22            Both of Plaintiffs' state law claims are premised on the Defendants' negligence.  (*See* ECF

23   No. 60 ¶¶ 95, 100.)  The parties agree California law controls as to whether suicide is an

24   independent intervening cause that precludes negligence liability.  Thus, the elements for liability

25   are as follows:

26                (1)     defendant's obligation to conform to a certain standard of

---

27   [2]     Defendants also assert that Defendant Cate is entitled to qualified immunity.  However, the Court does not
28   reach this matter because Plaintiffs have failed to allege facts to state a claim for relief against Defendant Cate under
the First Amendment.

1

2

3

4

> conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." *McGarry v. Sax*, 158 Cal. App. 4th 983, 994, 70 Cal. Rptr. 3d 519 (2008) (internal quotations omitted).

5

6

*Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009).    Under California law, suicide is an

independent intervening cause of injury:

7

8

9

10

11

> where the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death.   On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death.

12

13

*Tate v. Canonica*, 180 Cal. App. 2d 898, 915 (1960).

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Even viewed in the light most favorable to Plaintiffs, the allegations of the SAC are insufficient to support a finding that Scott had an "uncontrollable impulse to commit suicide at the time of his death." *Id.* Plaintiffs allege that at some point in 2009, Scott sought treatment for anxiety and depression caused by the toll that the "persistent verbal abuse and harassment" took on him and that he was prescribed anti-anxiety medication and antidepressants. (ECF No. 60 ¶¶ 40–41, 44.) Scott continued to work at HDSP until July 2011. (ECF No. 60 at ¶ 50.) A few days before his suicide he called HDSP to quit. (ECF No. 60 ¶ 50.) The sergeant with whom he spoke told him "to take a short leave to consider his decision to quit." (ECF No. 60 ¶ 50.) Scott told his wife about the call and he was "still extremely distraught and filled with despair." (ECF No. 60 ¶ 50.) The next day Scott received a call from another sergeant. (ECF No. 60 ¶ 51.) Scott spoke with him for about an hour and told him about the alleged directive from Defendant Simmerson to falsify the worker's compensation claim and the subsequent harassment and abuse. (ECF No. 60 ¶ 51.) Scott told his wife he was going to quit because he didn't want to return to work "and be labeled a 'rat.'" (ECF No. 60 ¶ 51.) The next morning, Scott told his wife he was going to HDSP to talk with Defendants McDonald and Simmerson. (ECF No. 60 ¶ 52.) He hugged and

17

1    kissed his wife and said goodbye, and his wife had no indication that would be the last time she

2    would see him.  (ECF No. 60 ¶ 52.)  Scott did not meet with Defendants McDonald or

3    Simmerson that day.  (ECF No. 60 ¶ 53.)  His body was discovered the next day, approximately

4    two hundred yards from his truck on a dirt road outside Susanville, California.  (ECF No. 60 ¶

5    55.)  Several short notes were discovered inside the truck. (ECF No. 60 ¶ 55.)

6           None of the allegations in the FAC state or support an inference Jones was acting under an

7    uncontrollable impulse when he committed suicide.  *See Tate*, 180 Cal. App. 2d at 918.  As this Court

8    found in its previous order, the allegations of events leading up to Jones' suicide set forth *supra*

9    suggest that Jones "had the opportunity to appreciate the nature of his actions." *Corales*, 567 F.3d at

10   573.  In particular, Jones had taken steps to quit his job at High Desert, which decision he attributed to

11   the years of alleged abuse and harassment, and he wrote several notes to family members before

12   committing suicide.  *See Corales*, 567 F.3d at 573 (record suggested decedent had opportunity to

13   "appreciate the nature of his actions" where he attended classes after the alleged triggering event,

14   spoke with his mother and another person, and wrote a detailed suicide note).  The fact that

15   Defendants Simmerson and McClellan were allegedly instrumental in creating a hostile work

16   environment unfortunately does not change this Court's analysis.  Similar to when the claims

17   were alleged against Defendants Cate and McDonald, Plaintiffs cannot establish that Scott was

18   acting under an uncontrollable impulse when he committed suicide.  Therefore, despite

19   Defendants Simmerson and McClellan's actions, Scott was in a state where he could appreciate

20   the nature of his actions, as evidenced by the events leading up to his death.  As such, the Court

21   finds that Scott's suicide was an independent intervening cause of his death.  Therefore, the Court

22   grants Defendants' Motion to Dismiss Plaintiffs' state law claims, Counts III and IV, without

23   leave to amend.

24              2.   Motion to Strike

25          Defendants move to strike two parts of Plaintiffs complaint: "all portions of the SAC

26   which assert allegations of harassment that were not motivated by Jones's protected speech or

27   attributable to Simmerson or McClellan[:] ¶¶ 28, 30, 31, 48, 49" and "the portions of Plaintiffs'

28   successor-in-interest claims for relief, which seek damages beyond those permitted under

18

1   California Code of Civil Procedure section 377.34[:] SAC, ¶¶ 61, 62, 68, 69, 86." (Mot. To

2   Strike, ECF No. 61.)  Because Plaintiffs' state law claims of wrongful death and negligence are

3   dismissed, the Court hereby denies Defendants' motion to strike Plaintiffs' SAC paragraphs 61,

4   62, 68, 69, 86 as moot.  Thus, the Court only addresses Defendants' motion to strike portions of

5   the SAC that assert allegations of harassment that were not motivated by Scott's protected speech

6   or attributable to Defendants Simmerson or McClellan. (ECF No. 64 at 4–8.)

7         Defendants argue that several of the alleged incidents of harassment should be stricken

8   from the SAC because Plaintiffs fail to show that the alleged harassment was motivated by

9   Scott's protected speech.  (ECF No. 64 at 5.)  They also assert these incidents are not attributable

10  to Defendants Simmerson and McClelland and therefore should be stricken.  (ECF No. 64 at 5.)

11  Particularly, Defendants move to strike allegations of (1) the March 2007 pepper-spray incident,

12  (2) the 2008 verbal harassment and random drug testing, and (3) "the 2011 comments by an

13  unidentified Lieutenant and correctional counselor, and the excessive force investigation." (ECF

14  No. 64 at 5–8.)  Plaintiffs oppose Defendants' motion, asserting that these incidents should be not

15  stricken because they are background information which is necessary to inform the Court of the

16  nature of Plaintiff's claims and provides context to the harms suffered by Scott.  (ECF No. 66 at

17  4.)  This Court agrees.

18        A court may strike from the pleadings any redundant, immaterial, impertinent, or

19  scandalous matter.  *Yursik v. Inland Crop Dusters Inc*., No. CV-F-11-01602-LJO, 2011 WL

20  5592888, at *2 (E.D. Cal. Nov. 16, 2011).  Furthermore, a court will only consider striking a

21  defense or allegation if it fits within one of these four categories.  *Id.*  "Ultimately, whether to

22  grant a motion to strike lies within the sound discretion of the district court."  *Neilson,* 290 F.

23  Supp. 2d at 1152.  "Allegations supplying background or historical material or other matter of

24  evidentiary nature will not be stricken unless unduly prejudicial to defendant."  *Le Duc v.*

25  *Kentucky Cent. Life Ins. Co.*, 814 F. Supp. 820, 830 (N.D. Cal 1992).

26        At the outset, the Court notes that Defendants do not argue that the incidents are

27  prejudicial, but instead assert that the incidents are impertinent and immaterial to the First

28  Amendment claims.  (ECF No. 64 at 5–8.)  Immaterial matter is "that which has no essential or

1   important relationship to the claim for relief or the defenses being pleaded" whereas impertinent

2   matter "consists of statements that do not pertain, and are not necessary, to the issues in

3   question." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (internal quotation

4   marks and citations omitted), *rev'd on other grounds*, 510 U.S. 517 (1994).  The Court does not

5   find these incidents to be impertinent or immaterial because the incidents act as background

6   information for Plaintiffs claims.  *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,

7   113 (2002) (holding that courts have used prior acts as background evidence in support of a

8   retaliation claim).  Even though these incidents do not involve Defendants Simmerson and

9   McClellan, the incidents help with understanding the environment at HDSP and additionally give

10   background for Scott's employment at HDSP.  Therefore, these facts help with understanding the

11   nature of Plaintiffs' claims, and the Defendants' Motion to Strike is denied.

12       **IV.   CONCLUSION**

13       For the reasons set forth above, the Court hereby GRANTS IN PART and DENIES IN

14   PART Defendants' Motion to Dismiss (ECF No. 61) and DENIES Defendants' Motion to Strike

15   (ECF No. 63).  The Court orders as follow:

16           1.   Defendants' Motion to Dismiss Count II is GRANTED as to Defendant Cate,

17               and DENIED as to Defendant McDonald;

18           2.   Defendants' Motion to Dismiss Count III is GRANTED;

19           3.   Defendants' Motion to Dismiss Count IV is GRANTED;  and

20           4.   Defendants' Motion to Strike is DENIED.

21   Because Plaintiffs have been given multiple opportunities to amend their claims and are clearly

22   unable to allege facts to support the claims dismissed above, the Court finds that further

23   amendment would be futile and thus declines to grant leave to amend.

24       IT IS SO ORDERED.

25   Dated: January 22, 2016

26

27                           Troy L. Nunley
                            United States District Judge

28